Good morning, Your Honors. Benjamin Pavone appearing before the appellant, Fred MacDonald. Can I ask you again to speak up? Yes, of course. Again, Benjamin Pavone before the appellant, Fred MacDonald. I think I'd like to spend a few minutes addressing a point that was not covered very well in the briefs, which is the rule that if you don't include a dismissed claim in the complaint, then you can be construed to have waived that claim for purposes of appeal. That doesn't exist anymore. It was cited in the government's opposition brief as a basis to dismiss our appeal. If that point is settled, then I'm happy to... But that's not the issue. I mean, the bigger issue is that you have... You voluntarily dismissed the whole case. Well, that's true, but I mean... So what's the appeal from? Well, having voluntarily dismissed the case since there was no way to proceed successfully... Right. You voluntarily dismissed it without prejudice. Right. And there's case law that says that a voluntary dismissal can be appealed. With prejudice. No, I think that some recent law I checked said that you can appeal a voluntary dismissal, whether it's with or without prejudice. Well, that can't be, and it's not true. I mean, in terms of the case law. I think I saw... I don't know if I'm going to be able to cite that to you right now. Well, that's the key to the jurisdictional question. I mean, first of all, there is case law, but second of all, think about it. If it's voluntarily dismissed without prejudice, what are we appealing from? Theoretically, you can come back tomorrow and refile the whole thing again. So what's the appeal from? Well, when a party does not indicate that he does intend to further prosecute, he concludes all claims, he dismisses the entire action, and he proceeds to appeal... I thought you did say you wanted to continue it. No, I mean, only if this Court were to reverse the trial judge's... But there were several claims that the district court never even ruled on. There was, you know... What you did was you tried to get an interlocutory appeal. You didn't. What you should have done at that point is, if you wanted to dismiss the Fifth Amendment claims because you thought they were weak, was go to the district judge and say, all right, I'm not going to amend the complaint with regard to the Fifth Amendment claims. Either I'm going to stand on them or I'm going to dismiss them, you know, with prejudice, and you'll never see them again, and then gone on and appealed the claims that she, in fact, decided. But as it was, that's not what you did. You dismissed the entire case voluntarily without prejudice, then tried to get a judgment from the district court after you had already dismissed it. How could you issue a judgment after you've already dismissed the case voluntarily? So what's the appeal from? Well, again, it was my impression that when you have a series of adverse rulings... I'm sorry? It was my impression that when you have a series of adverse rulings, okay, which knocked out all of my case, I had one little thread of a claim left in the Fifth Amendment which had no damages, so I dismissed the case in furtherance of challenging those dismissals. I mean, what was I supposed to do? Go to trial? You're supposed to stand there and you're supposed to let her enter a judgment. I just told you what you were supposed to do. You're supposed to dismiss the claims that she hadn't ruled on if you didn't want a ruling on them and were willing to stand on them to never get a ruling on them, and then let her enter a judgment. I did request the trial judge to enter a judgment. After you dismissed it. Well, right. I mean, it wouldn't really be proper to request the court to enter a judgment for a claim that was pending. That's why I dismissed it. Nonetheless, I mean, the governing principles, as I understand them for federal appellate jurisdiction, is whether the case was pragmatically terminated. I mean, I thought that was a standard under Romoland and some other cases in the brief where, you know, if the case came to a practical termination, and it did because there was nothing left to litigate, and I lost every major argument, you know, in terms of... Are you willing, first of all, to stand here now and tell us that you're not going to try and refile the Fifth Amendment claims? I'm not going to try and refile any claims. I represented that to the Court in the papers. If this appeal were to be dismissed, this case is over. Well, the Fifth Amendment claims surely aren't before us. The Fifth Amendment claim is gone. I mean, the Fifth Amendment... It's gone forever. You're never coming back with it. Well, if this Court were to reverse it on 1252G grounds, in other words, this whole case turns on its application of 1252G. If it says, sorry, 1252G bars jurisdiction, then all of my claims are gone. Well, the district court held otherwise with regard to your Fifth Amendment claim. Well... And you dismissed it with... I mean, she gave me this little tiny sliver of a window that gave me a claim with no damages. All right. So you're not willing to stand up here and tell us that in any event that we should regard the dismissal of the Fifth Amendment claims as being with prejudice? I probably am willing to tell you that I'm willing to acknowledge that all of my claims, if this Court does not grant me relief... No. Let's suppose you win here. Then what? Is that going to happen to the Fifth Amendment claims? Probably I would not go forward on it. How about a no, I won't? Period. Exclamation point. Well, all right. I mean, I'm here primarily for the Fourth Amendment claim. I think the Fifth Amendment claim is a loser. That's why I didn't pursue it. Primarily... If you want me to stand here and say... Primarily and probably they're fudge words. Yeses and nos are not fudge words. All right. I will stand here and say, no, I will not go forward with it. The Fifth Amendment claim is over. So... All right. That puts you in slightly better shape. Go ahead. Well, thanks. Thank you, Your Honors, for helping me. Apparently I need it. You're just making up the procedure of the rules as you go along. It's very simple. You've got to get a judgment entered.  Oh, but you had to... Why don't you go over there? Go before the court and ask the court. Well, I was under the impression that when you voluntarily dismiss a case, that's essentially the equivalent of a judgment. You were under the wrong impression. I mean, you've got to read the rules and see how it works. Did the court have any other... You're being under the wrong impression. It just provoked a lot of work and research. Well, again, I was operating... Well, I mean, you're operating and we're doing the work for you. And, you know, there's nothing there anymore for you. It's gone. Again, I wasn't just operating on an impression. I mean, the pragmatic termination of a case is the... It doesn't work that way. All right. It doesn't work that way. Did the court... Well, if the court doesn't... If the court is satisfied that the prior earlier amendment... In other words, if the Fourth Amendment claim is still in play... Well, let's go on as if they are for now. Go ahead. Well, actually, I really didn't have anything else I wanted to address. I was really going to take my time to field questions from the panel about the Fourth, you know, about American Indian rights. I mean, it was comprehensively brief. Our problem at this juncture has nothing to do with American Indian rights. It has to do with whether there's a preclusion of your Fourth Amendment claims under the statute in the Sissoko case. Well, that I'd be happy to address. You know, I'm comfortable with Sissoko. I mean, I think the court, you know, after a long procedural odyssey in it, reached the right decision in Sissoko. And I don't think it has any... It creates any problems for me because, you know, of course, in Sissoko, the petitioning party had volunteered for custody, essentially, by requesting asylum. Rather than being, you know, forced... Well, the problem... I mean, I don't know that this has anything to do with the 1252G claim exactly. And I think your argument about Hovsepian and Alley in those cases is, you know, at least colorable. But the problem is that your client went... He could have said the day they took him into custody, wait a minute, I'm a Canadian Indian. And he didn't do that. And he stood there and he let them deport him. And, you know, and now he's retroactively suing for damages. Now, I can't put my finger on what's wrong with that, but it certainly doesn't feel right. I can tell you what's wrong with that. It's that that's not how immigration practice works down there. The record shows, we put in a declaration in which he, you know, was part of our opposition papers, that you get two questions down in San Diego. One, do you want to challenge it? And two, well, you get one question, do you want to challenge it or not? And if you challenge it, you sit in custody for a really long time. And so... Well, that may be true of most people. But if he had had a... There are volunteer organizations down there that have lawyers that represent people. And if he had just said to them, wait a minute, you know, I'm just out of this whole system, it's not even arguable, well, you have no idea what would have happened. And to have people being... In some ways, it looks like exactly what 1252G is designed to deal with, if I have the right number. Yes, I do. Because you have a situation where there's a perfectly good... Well, there is a remedy in any event, which is considered to be good enough for everybody else. And to say that you don't have to use it and instead you can just come back years later and sue essentially for damages for the deportation that you could have avoided had you used your remedies is a peculiar business. Well, again, I would disagree with several of the premises. One, I mean, he got taken into custody, you know, not really knowing what his rights were. I mean, he got pulled in. He was defined as an American S-13 Indian. I mean, when you're defined as someone who can't be deported, I don't think it... You know, even this court has said the burden of production falls on the party who should know best. You know, he's defined as someone who can't be deported. So it's really immigration's job to say, look, sorry, sir, we should have never deported you. It's not his job to say, look, I want to educate you on the nuances of S-13 immigration status. He doesn't know that. He didn't know that. I mean, he knew that he was an American Indian, but he didn't know, you know, Aikens and... So can anybody... I understand you think the American Indians are different, but suppose they deport somebody from... Like the case we just had before, okay? They're deporting somebody for being an aggravated felony under a statute that really isn't an aggravated felony. Okay? Now, can somebody simply let himself get deported for that and then turn around later and... He may have a defense to a criminal prosecution, but can he bring a Bivens action for that? Well, you know, it's one thing to, let's say, you know, have a dispute, okay? In other words, there are immigration disputes and, you know, every litigant has kind of the obligation to come in and make his case. And if he shouldn't have been... I'm positing an instance where it's absolutely clear. This didn't happen before Moncrief. It happened after Moncrief and under Moncrief. Well, I mean, it's... What is clarity? I mean, you know, he really doesn't know. I mean... Your answer has to be yes. That guy could also bring such a case. I mean, if he's... My guy is not an alien. I mean, he's defined as not an alien. It would be like someone charging an American citizen with deportation. I mean, are you going to say that if you get picked up tomorrow or I get picked up tomorrow or the bailiff gets picked up tomorrow that, you know, and they got confused for somebody else's name, that we can put the hold them for months, sometimes years, and let him prove his way out of it? You know, go get yourself a lawyer. Fight it out with a habeas corpus petition. I mean, are you prepared to say that? Because American Indians enjoy that kind of same parry-pursue standing when it comes to their immigration status. And so, you know, I draw the line at, well, was there sort of a reasonable or colorable basis to have charged him? You know, when your typical alien, foreign, you know, you say, okay, well, he's clearly a foreigner. He's clearly subject to being charged. And, you know, we're not sure. Maybe, you know, his aggravated felony really isn't just a misdemeanor felony, a misdemeanor. But, you know, at least there's sort of a colorable reason to do it. But, I mean, you start charging citizens or people who are the equivalent of citizens, then I think you face liability for those kind of mistakes. You know, that's where I would draw the line in terms of when the government is subject to damages, when they're charging people who just cannot be charged. You know, again, I cited the example of trying to charge an owner of a car with theft of it. I mean, you just can't do that. So that's why I think SOCO, as you originally mentioned, is not a problem for us. Was there any other questions the panel had? If not, you know, I guess maybe I just wanted to. You're an interesting guy, and I enjoyed reading some of this historical background. But you just can't assume what the rules are. You've got to do a little work before you jump. Well, I mean, all right. I mean, you make a good argument. You know, our immigration system needs a lot, a lot, a lot of fixing. And I don't disagree with you on that. I've been trying to do that for years. Well, I appreciate that. Well, I mean, I guess I don't know if that's just sort of a final comment, and I should move on here. You're a charming guy. All right. Well, thank you for your time. Okay. Thank you. The government's going to rescue you right now. I should do that by remaining quiet, I think. I'll do that by remaining silent and just wait for questions. But may it please the Court, I'm Sam Betwee. I represent the defendants. I would just point out that when ICE did find out that Mr. McDonald is a Canadian Indian, not an American Indian, but a Canadian Indian, they sua sponte reopened the removal procedure. All right. But the problem is, I want to go back to the jurisdictional question in a minute. Sure. But the problem is that any knowledgeable person looking at the documents should have known that, right? Your Honor, I absolutely, the mistake, there's no question, the mistake was that there was a clerk who set up, who put the papers together, researched the databases, saw S13, and didn't look up to see what S13 was. So while I was hard on your opposing counsel, in fact, although Mr. McDonald didn't say he was a Canadian Indian, the agency knew it and should have known it at the point they were operating. Well, I'm not. Because I gather this S13 thing is not complicated. It's not even ambiguous. Is that right? Well, I'm not, all I can say, Your Honor, is I talked to Mr. Haraldson, the one who stamped the papers, who received them from Mr. Karunas. He said if I had known he was a Canadian Indian, that would have been out, that would have been it. Everybody knows you do not send Canadian Indians back. There's no question about that. It was just a clerical error that got compounded. The IJs, it went before two immigration judges, ICE attorneys. I mean, this thing went on and on, and nobody said what's S13. Well, that just makes it worse, doesn't it? It was a whole series of assumption, assuming, and then, of course, as you say, Mr. McDonald, now he says in a declaration that he knew all along he was a Canadian Indian and decided to say nothing because he thought it would make the process last longer. Let's go back to the jurisdictional issue for a minute, I mean, our jurisdictional issue. Right. Now that we know, we've finally extracted a commitment that he's not going to come back, why isn't this case similar to James, for example, now? Well, in James, what I have written here, note to myself, is that the appellant had specifically stated to the district court that it was dismissing the remaining claims, and that's the problem here is that Mr. McDonald did not specify that. But we now know as a practical matter. I'm sorry? We now know as a practical matter that the other claims, the Fourth Amendment claims and so on, aren't coming back because there's already been a decision against him, and the others aren't coming back because he has made a commitment that they're not coming back. So why isn't this functionally equivalent to a voluntary dismissal with prejudice, which he could appeal? And I'm sorry, what would be the consequence that Your Honor is suggesting? Well, he could appeal a voluntary dismissal with prejudice. Yes. Yes, Your Honor. And I asked for that. I opposed the motion for voluntary dismissal without prejudice and wanted it with prejudice because I wanted to get attorney's fees, and I lost. So Judge Gonzales specifically had considered with prejudice and denied my motion, my opposition. So you're saying that the reason we couldn't consider is that it was because he had an opportunity to do that and he didn't. That's right, Your Honor. That's correct. In fact, that's correct. I was willing to dismiss with prejudice, but that was opposed, and so we ended up without prejudice. I suppose if it was a mistake, it sounds like it was a mistake. We didn't know at the time. We just thought he was throwing in the towel. You didn't know at the time what? I'm sorry? We thought he was just throwing in the towel, and apparently Judge Gonzales thought so, too, as she said in her May 25th order. We have no idea that he had some intent to appeal. That's the problem. But if there's a mistake, then there should be, under the rules, a 60B motion to try to reopen and correct the mistake, but we never got that. So you're also a position where there's no jurisdiction. There should be ways to figure out a way for tolling, huh? The rules are what they are. I'm not here to advocate anything different than that. No. Or... Well, there were certain... ...construe what he did in a way that would allow the case to go forward. I'm sorry? I'm sorry, what was the question, Your Honor? What? I'm sorry, was there a question I didn't hear? No, I'm just talking. Oh, okay. Yeah. No, as I said, in retrospect, looking at the case, with the benefit of hindsight in the last week, reviewing the case for the umpteenth time, thinking what would I have done? I think if I realized I made a mistake, I would have gone back and brought a Rule 60B motion. What about, are you aware of the Concha case, which may be pretty close in as to a situation in which, because the claims, the Fourth Amendment claims were in fact, the claims were dismissed with prejudice, right? Yes, Your Honor. Right. So, I mean, what do you really, I mean, we all sort of know what he really meant to do, or at least what he now, perhaps what he meant to do was to leave the Fifth Amendment claims open, but he's now walked away from that. So, if it were a voluntary dismissal with prejudice, he could appeal from it, right? That's my recollection, Your Honor, when I was researching this. Okay. And Concha's voluntary dismissal with prejudice permits the appellate court to review the action of the district court that the plaintiff believes to be determinative because essentially it can't be reopened again. So, in an instance in which he called it without prejudice, but had already lost the relevant claims with prejudice, why don't we just say, you know, in fact, as to those claims, it was dismissed with prejudice? So, somehow the prior dismissal of the claim with prejudice merged into a voluntarily dismissal without prejudice. Right. And so the ones without prejudice were the Fifth Amendment claims, which is a problem because, for him, because you then have what's equivalent to an interlocutory appeal. But if those claims are essentially withdrawn, I mean, it's all becomes very formulaic at that point. Right. Your Honor, I suppose there's some way to change the law or evolve the law. Well, I'm suggesting that. We'll go with it. You know, we'll go with whatever the law is. It's not that I'm advocating that the rules should be one way or the other. They just, this is how they are today. Let me ask you this. Pardon me. Were they aware that this gentleman was Canadian? No. Yesterday he was Canadian. Yesterday. Did they call a Canadian consul general? Absolutely. They had to get travel documents to send him back to Canada. No, no. Did they call a Canadian consul general and notify him that a Canadian citizen was in custody? You know. I know what you're asking, Your Honor. I know that, I don't know the answer. I do know that they gave him an opportunity. They're supposed to do that, right? Yes, Your Honor. Yeah. Did they do it? Because they never did before. And I did, I think, a dissent on that. I thought at least it ought to be a factor and I'll have to find that dissent. But, you know, people thought I was a little crazy for bringing that up. And now it's the law, right? Isn't it? Say something nice to me. Isn't it? I think it was a great idea and I know it's done routinely. But they don't listen, you see, they don't listen to you. I know that he, in the record, 1-11, he declined. ICE doesn't listen to you. I'm sorry. ICE doesn't listen to you. I'm sorry, Your Honor. ICE doesn't listen. ICE doesn't listen. They've got so much to do. Actually, I like the way ICE runs in San Diego. I've had a very good relationship with ICE. The record shows that Mr. McDonald was... Well, sometimes they don't run it that well. I think they do a pretty good job. Well, maybe we say all the bad ones. Anyway, I just want to point to page 1-11 where he declined contact with the consulate and then also in the record where we did contact the consulate to get the travel documents. And, again, another point at which even the Canadian government didn't know that he was a Canadian Indian to say something. Could you address the 1252G question? And in particular, why isn't, I mean, it's a very fine line and one which I must say is very murky to me, but why isn't McDonald correct about the import of Hovsepian and Ali as it applies here? That is, that he's asking for a purely legal determination with regard to his status, and it's therefore not a review of the commencement proceedings. Now, I must say I don't understand what the difference is between necessarily, between those cases and a Sissoko Bivens situation, even though I wrote Sissoko, and was on the panel on Hovsepian. But it does have a flavor. Oh, and also the discretionary point. I thought the discretionary, I mean, that is his basic point here, and Hovsepian does say this, and Ali does say this, that, and the Supreme Court case in Arab-Arabian says, whatever that, American, Arab-American, that the point of this provision was to deal, was to preclude review of prosecutorial exercise of discretion, and here there is no discretion. What's wrong with that? Okay, I think I understand your question, and what I think is, what I think the rule is that hasn't been stated quite that clearly by this Court, is that this 1252G is going to apply when the detention was mandatory. There was no discretion. It necessarily arose from the decision to commence removal proceedings. There was no discretion apart from that. But that was only why we were reaching the detention, but it doesn't explain why with regard to the proceedings. I mean, Hovsepian and Ali and Arab-American were all, as I recall, prospective cases, and are different from this one in that respect, but they were injunctive cases. But still, what you just said explains why they reached the detention, but it doesn't explain why there was discretion with regard to the decision to commence proceedings, which there wasn't. They shouldn't have done it. Well, Your Honor, I mean, he is an alien. There's no question. Everybody from our perspective in the world is either an alien or a national. And he could have been placed in proceedings to determine whether his claim to being a Canadian Indian was correct. He's just the same as someone who claims a derivative or acquired citizenship can be placed in removal proceedings and have to show that. They may be a citizen, in fact, but they presume to be an alien if they're born outside the United States. So it wasn't that he could not have been placed in removal proceedings. It's just that it's, I'm just saying it's a matter of policy and practice. It would not have happened if they had known, if he had said something. But, in fact, in this case, no one was questioning whether he was a Canadian Indian. But it could have. If the INS came and picked me up tomorrow, was born in Cincinnati, Ohio, and wanted to place me into deportation proceedings, your position is I couldn't do anything except wait, go through the proceedings. Well, of course, Your Honor, born here, you're solely born on the soil. You have a constitutional right. It's very different than someone who's born outside the United States. But does 1252G preclude me from doing anything but waiting for the proceedings to go through? I don't know, Your Honor. I haven't seen that case yet. I'd like to represent you, Your Honor, in that case. But I don't know. But the case is that you have to do with the choir. There are people born every day who are born outside this territory and are American citizens. That's right, but they're presumed under law to be aliens until they meet their burden of showing otherwise because they were born outside. No, but he did do that. I'm sorry, Your Honor? He showed his papers, but no one followed up on it. Right, he showed his papers that he was an alien. He was an alien. It was a question. Just real quickly, I think I said it in my brief, but I think that that's the case, I believe. It talked about a legal question that concerns the backdrop. The backdrop of this case is that DHS bends over backwards for Canadian Indians. But what was being reviewed was an injunction not to commence proceedings, basically. And nonetheless, we said that the proceedings hadn't yet been commenced, but it was an injunction to preclude the commencement of proceedings against an individual. And we said that doesn't come under 1252G because it's dealing with a background legal question. Like a pattern of practice or a legal backdrop. This was a mistake. This was simply just a mistake. Someone didn't look up S13. It's not a pattern of practice case. There's nothing in this case that says that we're still sending Canadian Indians back because we're flaunt, thumbing our nose at the law. It's not that kind of a case. It was just a simple mistake. Well. Yeah, but who suffered for it? Well, I wish Mr. McDonald had spoken up as well, and it would have been settled right away. Well. A lot of times folks don't really realize all the implications of their status and what they should do. They don't have a lawyer there. It's a frightening experience for them. They look around. And they make certain decisions, which probably aren't the best ones, but we're supposed to know that. Right. I don't think that Mr. Corona feels justified in not having looked up S13. Did he get a certificate of apology? Sorry, Your Honor. Did he get a certificate of apology? Absolutely. No one feels justified about what happened, Your Honor. Well, he's got something he can frame. All right, thank you. Thank you for your time, Your Honor. I'll give you a little rebuttal. Yeah, just one point. I mean, I guess, well, two quick points. One is, I think the court raises a good question about who should bear responsibility for mistakes. I mean, in no other area of law do you just get—the government almost says it casually, like, well, it's just a mistake, so we can't possibly— Well, you made a mistake, too. Well, you mean procedurally? Yeah. Yeah, okay. I'm already condemned for that. But in terms of things that had, you know, life-altering impact, you know, normally the person who makes a mistake ends up paying the consequences for it, you know, in terms of tort liability and contract liability and those sorts of things. Oh, but there's legions of circumstances where there's immunity. There's governmental immunity. In fact, that's why you have the Federal Tort Claims Act. So I don't see where this is getting you. Well, I mean, assuming everything—assuming all other things being equal, I understand, you know, people lose cases all the time because their procedural compliance is imperfect. But, I mean, when we talk about deporting someone who, you know, is defined as someone you can't deport, then, you know, I really think that shifts the burden of production over the state to justify why they should not be liable, you know, in terms of legal outcomes. And I guess just one other thing I'd leave you with is that Mr.—as soon as Mr. McDonald got out of custody, he, you know, he was deported to Canada. He came right back, and he said, look, you couldn't—you weren't supposed to do this. Okay, he held me for two months. You know, I understand you didn't know. I didn't know. Nobody knew. But it still took them another year, and he remained exiled outside of the United States. At that point, I didn't understand. If he came back at that point, why did he go back to Canada? Because he was at risk of being incarcerated again. He came back. He passed the border, which they couldn't minimally deny. He went back to the San Diego Immigration Office. He said, here's my authority. Here's Aikens and Yellow Quill and this and that. And they said, oh, great. Well, we'll think about it. But he has to then leave the United States under threat of being arrested again if they decide that he's wrong or if they just decide that, hey, look, you're the same guy that we just deported a minute ago. We're going to have to incarcerate you and deport you again. So he remained outside back in Canada for a year waiting for this decision. So in terms of, well, as soon as we knew or we're always in good faith if we'd only known, well, that's still a year's worth of damage that he experienced even when clearly they were on alert. I was thinking before, though, that what you have now is a Fourth Amendment claim, and the Fourth Amendment claim goes to the incarceration. Does it go to the year period that he was out of the country? We've always thought that there was enough causation to say that it does extend. We were seeking damages both for the incarceration and for the period of exile because we felt that until they cleared him, which took a year. He was essentially seized. He's been seized and he's been under threat of arrest at all times in this country. Possible. He wasn't willing to risk it having been arrested once and incarcerated in the conditions in San Diego. Anyway, thank you for your time. Thank you.
judges: Pregerson, Murphy, Berzon